UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------
KARL DIBBLE, KARL DIBBLE INC. and RIVER
ROCK SUPPLY CORP.

|  |  |
|---|---|
| Plaintiffs, | Index No 19-cv-07339 |
|  | FIRST AMENDED |
| -against- | FEDERAL |
|  | COMPLAINT |

DAVID SCHROEDEL, ANTHONY GIACCIO,
HUDSON VALLEY MANAGEMENT CONSULTING,
LLC, JOHN LEAVY, SLEEPY HOLLOW LOCAL
DEVELOPMENT CORPORATION, LLC,
ANDREW CORTESE, CORTESE CONSTRUCTION,
INC. KENNETH WRAY, THE VILLAGE OF SLEEPY
HOLLOW, JAMES MCGOVERN, EARTH
IMPROVEMENTS, INC. and Defendants Joseph Doe
And Jane Doe, No. 1 through 10, being individuals whose
Names and/or conduct is not presently known to the
Plaintiffs

                              Defendants.
-------------------------------------------------------------------

KARL DIBBLE. KARL DIBBLE INC. and RIVER ROCK SUPPLY

CORP. by and for their amended complaint against the Defendants, respectfully

show this court as follows:

<u>Summary of Case</u>

1.      Plaintiffs bring this action against Defendants to recover damages

under the Racketeer Influenced and Corrupt Organization Act ("RICO") 18 USCA

1961 to 1968 including engaging in mail and wire fraud (18 USC 1341, 1343),

1

bribery (18 USC 1962(d) and New York State Penal Law 180.08 and 200.03),

knowingly causing the destruction of documents for use in an official proceeding

(18 USC 1961 B and 18 SC 1513 (b) (2) (B)), under the Sherman Anti-Trust Act

15 USC 1- 38) as well as seeking recovery under a number of related state causes

of action, including violations of the Donnelly Act and tortious interference with

business relationships (both existing and potential).

## JURISDICITON AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to

18 USC 1964 (c), as well as 15 USC 1-38) and 28 USC 1331, as a federal question

as well as its right to hear related causes of action under its powers of pendent

jurisdiction.

3.      Venue is proper in this judicial district pursuant to 18 USC 1965 and

28 USC 1391 because defendants are subject to personal jurisdiction in this

judicial district, reside in this district, conduct business in this district and the

relevant transactions occurred here.

## PARTIES

4.      Karl Dibble is a resident of Sleepy Hollow, New York, residing at 315

North Broadway, Sleepy Hollow, and New York.  Karl Dibble is primarily

engaged in the business of transporting and moving various types of construction

materials as well as managing and implementing construction and building projects.

5.     River Rock Supply Corp. is a corporation, organized under the laws of the State of New York, with a supply yard at 311 North Broadway, Sleepy Hollow, New York.  River Rock Supply Corp. is owned by Karl Dibble and primarily engaged in the business of supply and delivering construction materials to construction sites and to contractors.

6.     Karl Dibble Inc is a corporation, organized under the laws of the State of New York, and located at 311 North Broadway, Sleepy Hollow, New York. Karl Dibble Inc. is owned by Karl Dibble and primarily engaged in working at construction sites, either as a sub-contractor for a developer or as the developer itself.

7.     Karl Dibble, River Rock Supply Corp. and Karl Dibble Inc. (hereinafter collectively referred to as the "Plaintiffs") are all persons under 18 USCA 1964 (c), who have suffered a compensable injury under that statute. Plaintiffs have also suffered injuries under common law and as a result of violations of state and federal anti-trust statutes.

8.    David Schroedel ("Schroedel") is a resident of Sleepy Hollow, residing at 487 Munroe Avenue, Sleepy Hollow, New York. Schroedel was <u>formally</u> a Village Trustee of the Village of Sleepy Hollow, but by 2017 no longer had such position when the acts complained of herein began to occur, while maintaining effective control over the Enterprises identified herein.

9.    Schroedel, at one point, was also chairman of the Sleepy Hollow Local Development Corporation ("SHLDC"). but resigned his position there after he maneuvered SHLDC to hire and pay his company, Hudson Valley Management Consulting, LLC. ("HMC") to perform services previously performed by members the SHLDC board. Despite resignation as Chairman, Schroedel continues to effectively run the SHLDC.

10.    Schroedel is a person within the meaning of 18 USC 1961(3) and 1962 (c) capable of holding a legal or beneficial interest in property.

11.    Anthony Giaccio ("Giaccio") is the Village Administrator of the Village of Sleepy Hollow, with offices at 28 Beekman Avenue, Sleepy Hollow, and New York.  Giaccio also currently works for the SHLDC as the CEO and is one of the primary deputies of Schroedel in the running of the SHLDC.

12.    Giaccio is a person within the meaning of 18 USC 1961(3) and 1962 (c) capable of holding a legal or beneficial interest in property.

13.    Hudson Valley Management Consulting LLC ("HMC") is a limited liability corporation, organized under the laws of the State of New York. HMC uses a post office box at 45 Beekman Avenue, Sleepy Hollow, New York, but primarily operates out of Schroedel' s home at 487 Munroe Avenue, Sleepy Hollow. Schroedel is the sole member of HMC

14.    HMC is a person within the meaning of 18 USC 1961(3) and 1962 (c) capable of holding a legal or beneficial interest in property.

15.    John Leavy ("Leavy") is a resident of Sleepy Hollow, New York, residing at 4 Millard Avenue, Sleepy Hollow, New York.  Leavy is also a Village Trustee of the Village of Sleepy Hollow and is the other primary deputy of Schroedel in Schroedel' s operations as the owner of HMC.

16.    Leavy is a person within the meaning of 18 USC 1961(3) and 1962 (c) capable of holding a legal or beneficial interest in property.

17.    Sleepy Hollow Local Development Corporation ("SHLDC") is a Local Development Corporation, organized under the laws of the State of New York with offices at 28 Beekman Avenue, Sleepy Hollow, New York.

18.    SHLDC is a person capable of holding a legal or beneficial interest in property.

19.    Andrew Cortese ("Cortese") is the President of Cortese Corp and resides at Harriman Road Irvington New York.

20.    Cortese is a person within the meaning of 18 USC 1961(3) and 1962 (c) capable of holding a legal or beneficial interest in property.

21.    Cortese Construction. Inc. ("Cortese Corp") is a New York Corporation with offices located at 145 Palisades Street, Dobbs Ferry, New York.

22.    Cortese Corp. is a person within the meaning of 18 USC 1961(3) and 1962 (c) capable of holding a legal or beneficial interest in property.

23.    Kenneth Wray ("Wray") is a resident of the Sleepy Hollow residing at 1 Riverside Drive, Sleepy Hollow. Wray is also the mayor of Sleepy Hollow.

24.    Schroedel was Wray's campaign manager when Wray ran for public office and still provides instruction and direction to Wray.

25.    Once mayor, Wray would appoint to the board of the SHLDC individuals selected by Schroedel.

26.    The Village of Sleepy Hollow (the Village) is a municipal corporation, organized under the laws of the State of New York with its main office at 28 Beekman Avenue, Sleepy Hollow, New York.

27.    To the extent required by law, and to the extent known at the time, the Village was given notice of the factual basis for the claims stated herein on or about February 5, 2018 and this action was initially filed in the State Courts (Supreme Court, Westchester County) within one year of such notice.

28.    James McGovern, ("McGovern") is a resident of Sleepy Hollow, New York, residing at 181 Hardwood Avenue, Sleepy Hollow, New York.

29.    McGovern is a person within the meaning of 18 USC 1961(3) and 1962 (c) capable of holding a legal or beneficial interest in property.

30.    Earth Improvements Inc. ("Earth Improvements") is a New York Corporation with offices located at 16 Riverside Place, Dobbs Ferry.

31.    Earth Improvements is a person within the meaning of 18 USC 1961(3) and 1962 (c) capable of holding a legal or beneficial interest in property.

32.    Named herein as Joseph Doe and Jane Doe No. 1 through 10, are individuals whose identity or the full scope of their involvement is not presently

known, but who assisted the Enterprises, identified herein, to advance the purposes of the Enterprises.

## FACTUAL BACKGROUND

33.    In 2014, the Village created SHLDC for the alleged purpose of developing land in the Village, consisting of approximately 29 acres previously occupied by a plant owned by General Motors and commonly referred to as the "East Parcel."

34.    After the SHLDC was organized in 2014, it received a donation of the "East Parcel".

35.    Schroedel, a former Village Trustee and was initially appointed chairman of the SHLDC by Wray.

36.    It was publicly announced by Schroedel and Wray, that the SHLDC would operate in a nondiscriminatory fashion and that work that it would solicit or contract for would be done by competitive bidding and seek to use local contractors.

37.    To advance the fiction that the SHLDC would operate in a nondiscriminatory fashion and that work it would solicit or contract to do would be

done by competitive bidding, the SHLDC adopted minutes and/or resolutions that stated that contracts would only be awarded by competitive bidding.

## THE ENTERPRISES

38.    In fact, SHLDC was to be used, and was used, as an Enterprise under 18 USCA 1961 et seq and conducted its affairs through a pattern of racketeering for the common purpose of generating both economic and non-economic benefits for the persons engaged in conducting the affairs of the Enterprise, as well as conferring benefits on persons not engaged in conducting the affairs of the Enterprise (the "SHLDC Enterprise"), but who participated in one or more of the predicate acts outlined below. Schroedel, Giaccio and Leavy were initially the members of the SHLDC Enterprise.

39.    In addition, an Enterprise also existed under 18 USCA 1961 et seq as an association in fact which was set up for similar purposes as the SHLDC, that is for the common purpose of generating both economic and non-economic benefits for the persons engaged in conducting the affairs of the Enterprise, as well as conferring benefits on persons not engaged in conducting the affairs of the Enterprise, but who participated in one or more of the predicate acts outlined below. This association in fact was initially established by individuals who were members of, or connected with, the Philipse Manor Association and who resided in

a particular area of the Village, known as Philipse Manor and/or employees or

officials of the Village and the contractors that they would use to rig bids (the

"Philipse Manor Enterprise"). This Philipse Manor Enterprise, like the SHLDC

Enterprise, was established at least as early as the spring of 2017. Schroedel, HMC,

Giaccio, Leavy, Cortese and Cortese Construction were initially members of the

Philipse Manor Enterprise.

40.    Schroedel, was the head of the Philipse Manor Enterprise and as with

the SHLDC Enterprise, Leavy and Giaccio acted as his deputies.

## THE ENTERPRISES ARE OPEN ENDED

41.    Both the SHLDC Enterprise and the Philipse Manor Enterprise, while

established at least as early as the spring of 2017, are open ended schemes and

continue through the present. The schemes constitute a "pattern" of racketeering

activity pursuant to 18 USC 1961 (1) (A), 18 USC (1) (B) and 18 USC (5) which

began at least as early as April of 2017 and continues at least through the date of

this pleading.

42.    The Enterprises are open ended and continuing. The SHLDC has

publicly stated that it intends to operate at least through the year 2025. As part of

its announced project, on information and belief, the entire East Parcel will need to

be raised a minimum of ten to 15 feet, requiring more than 500,000 cubic yards of dirt or fill to be transported and properly spread over the area before the construction and/or use of the East Parcel which has been announced can begin and the initial predicate acts, set forth below, are only a fraction of the transporting, spreading and managing of such material that will continue to be brought to the East Parcel.

43.    In addition, Schroedel, continues to direct the affairs of both Enterprises with Giaccio and Leavy as his deputies so the criminal conduct set forth below is continuing at the time of the filing of this complaint and likely to continue into the future.

44.    Neither the SHLDC Enterprise nor the Philipse Manor Enterprise are sued under this cause of action as persons liable for damages under 18 USC 1962 although the SHLDC is a defendant in some of the non-RICO causes of action.

**INTERSTATE COMMERCE**

45.    Both Enterprises were directly engaged in the production, distribution or acquisition of goods and services in interstate commerce in that the activities of the Enterprise affected interstate commerce having dealt with and entered into contracts with corporations outside the State of New York including but not

11

limited to hiring companies to move machinery and materials in and out the State of New York, to advance the proposed project on the East Parcel. As such both are RICO enterprises pursuant to 18 USC 1961(4).

46.    In addition, at least some of the predicate acts outlined below involved using the mails and/or wires in interstate commerce to advance one or more frauds perpetuated by the persons involved in one or both Enterprises.

47.    Each of the Defendants committed these predicate acts willfully or with actual knowledge of the illegal activities.

48.    The purposes of the Enterprises were advanced by related acts, which had a similar purpose.

49.    The primary purpose of the Enterprises and the participants in the Enterprises was to make sure that contracts on the East Parcel, and elsewhere when possible, were only awarded to designated persons, favored by the members of the Enterprises. On information and belief, such persons normally would have provided additional consideration, usually in the form of bribes, directly or indirectly to the members of the Enterprises.

50.    A second purpose of the Enterprises was to provide benefits, in the form of cash, or receiving services at greatly reduced costs or for free or using

public funds for private improvements to enhance the value of private property owned by the members of the Enterprises or those they associated with the Enterprises.

## PATTERN OF RACKETEERING

51.    The Defendants conducted the racketeering activity through a pattern of racketeering activity. The pattern of racketeering set forth below, have all occurred within ten years of the of the other acts of racketeering.

52.    The predicate acts were related, in that they have the same or similar purposes and results (making sure contracts are awarded to persons favored by the members of the Enterprises, often because of the willingness of such favored persons to provide brides or other additional consideration to the members of the Enterprises); the participants were the same (members of the enterprises) and the victims were the same (Plaintiffs, as well as other companies doing similar business).

53.    The predicate acts were not isolated events, but continuous.  In some cases, the predicate acts are continuing continue through the date of the filing of this complaint.

54.     The members of the Enterprises acted for their personal, pecuniary and political benefit of themselves and others who supported the Enterprises. The Enterprises operated particularly, but not exclusively, for the benefit of Schroedel, who acted as the supervisor or "boss" of both Enterprises.

55.     Each member of the Enterprises was aware of the purposes of the Enterprises. Each member operated or managed the affairs of the Enterprises. When the Enterprises needed acts to be performed, each member would advance the purposes of the Enterprises by performing the acts that needed to be performed.

56.     After their formation, the Enterprises determined to set up a separate business, to pass funds of the SHLDC and/or the Village for the benefit of its members, particularly Schroedel. To accomplish this purpose, on or about April of 2017, Schroedel established HMC, and had it, with the assistance of Wray and Leavy, named as the "consulting agent" for SHLDC. HMC was then given a contract, at $60,000.00 a year to "consult" with the SHLDC.

57.     In creating the SHLDC Enterprise and the Philips Manor Enterprise, defendants Schroedel, Giaccio and Leavy were aware that they would cause the SHLDC to operate in a discriminatory fashion and that bids would not be awarded by competitive bidding and they would continue that process and even expand it to deal with contracts awarded by the Village.

14

58.    After Schroedel was appointed chairman of the SHLDC, but before he resigned from that position, Schroedel recommended, on or about April of 2017, that SHLDC hire his company, HMC as a consultant and pay it to provide certain vague consulting services to SHLDC.

59.    On information and belief, the SHLDC, through Giaccio, purported to interview or attempt to interview, other candidates for the position of consultant, who like Schroedel, had little or no experience in development of land sites and construction projects, to create the illusion that an independent search was being conducted for a legitimate consultant.

60.    In reality, while Schroedel resigned and Giaccio assumed Schroedel's title at the SHLDC, Schroedel still directed the SHLDC as a non-titled, outside consultant, maintaining an "office" with the Village, driving a car with a "village employee" identification, having a direct dial to the supervising police officers of the Village and using that direct dial to the Village police to intercept and halt any activities on the East Parcel that he disapproved of without consulting Giaccio and/or the board of the SHLDC. In addition, as shown below, Schroedel would step in to make decisions and give directions to the members of the board of the SHLDC and Giaccio to advance the purposes of the Enterprises and would regularly travel with Leavy while continuing to direct the affairs of the SHLDC.

61.     At this point, Schroedel would be paid by the HMC, who was in turn paid by the SHLDC and the SHLDC would regularly receive funds from the Village to meet its expenses. Schroedel would also continue as head of the Philips Manor Enterprise.

62.     In awarding this contract, persons associated with the Enterprises and others, including Wray and Leavy, represented that Schroedel had great experience in implementing major construction and/or development projects.

63.     This representation was false when made and known by such persons to be false when made and that Schroedel had little or no experience in implementing major construction and/ or development projects.

64.     The real reason for designating HMC as a consultant was to pass money to Schroedel, so that Schroedel would be paid to facilitate the granting of specific contracts to those entities pre-determined to receive the contact and through that process, provide financial and/or political benefits to themselves or favored persons by essentially operating outside the law.

65. Such other activities included but were not limited to:

a) Without obtaining the appropriate permits for such work or obtaining approval of the Zoning Board or Planning Board, Schroedel had the SHLDC entered into a contract with an entity known as Judlau

Contacting, and for Judlu Contracting to pay the SHLDC $10,000 a month, to use the East Parcel as a staging area for work it was doing on the Metro North Railway, without Planning Board approval.

b) Used the SHLDC, the owner, developer and lead agency for the East Parcel, to do its own environmental impact study on the East Parcel, rather than utilize an independent agency that might uncover contaminations being brought onto the East Parcel or improperly disposed of there and thus allow the SHLDC to operate without complying with Environmental laws;

c) Using Village officials, primarily Wray, to advise the Connecticut owner of property at 193 Beekman Avenue who had acquired such property to develop, that the planning board and zoning board of the Village would not approve plans that they might submit for development and that therefore they had to sell their property to the SHLDC. At the time such representations were made, on information and belief, the Planning Board and Zoning Board had not been apprised, let alone decided they would not approve of the development of 193 Beekman Avenue by individuals as opposed to the SHLDC. The owner of the property, in reliance on the representations of Wray, sold 193 Beekman Avenue to the SHLDC.

d) Permitting and continuing to permit the storage of equipment trailers on the East Parcel by Stiloski Towing, that were not insured or registered, without approval from the Planning Board or the Zoning Board, ands falsely representing the property was use for emergency towing for $400.00 a month, without offering such opportunity to store equipment of the East Parcel to other potential bidders. The Village and/or the SHLDC have refused to provide any evidence of such payments by Stiloski Towing.

e) Permitted the Philips Manor Beach Club (the "Beach Club") (to which most of the individual defendants who formed the Philips Manor Enterprise were members) to dredge the private marina off the Hudson River and deposit untested results of the dredging on the East Parcel. The

SHLDC paid Cortese Corp. to build a platform to put such dredged materials into tubes and set up a program for drying to get the contamination out of the dredged soil, at no cost to the Beach Club or its members. On information and belief, the Beach Club, for years, had been unable to find a cost effective way to move the sludge that would be dredged off-site and thus the Enterprises used the resources of the Village to enrich the Beach Club and the members of the Enterprise who were members of the Beach Club.

f) Schroedel represented that soil that was dredged from the Philips Manor Beach Club site for placement on the Land Site, was clean fill, when, on information and belief, no recent independent tests were run and despite the fact that it was near the old GM factory site and just down river from the existing Con Ed site. Schroedel knew, or should have known, this dredged soil was likely to be contaminated soil.

g) Wray represented that his membership with the Beach Club did not influence his decision to take the soil which had not been tested for contamination only from the Beach Club and yet turned down similar fill offers from the Tarrytown and Nyack Marinas. Wray made no effort to make sure the Beach Club would be responsible for any costs of cleaning the contamination, despite the fact that allowing the dredged soil to be placed on the East Parcel, was a considerable economic benefit to the Beach Club and came at a cost to the SHLDC, which Schroedel sought to cover-up.

h) Using companies to bring in fill to the East Parcel land site, which Schroedel represented, was clean fill. A Request for Proposals ("RFP") for clean fill was put out and not awarded and no RFP was put out for recycled material. Instead Schroedel had the SHLDC allow New Jersey truckers to bring in recycled fill without checking for possible contamination by truckers who were picking the material up in Queens County, New York, from a company owned by Durante Brothers. Durante Brothers, at approximately the same time, were under investigation and eventually indicted for selling contaminated recycled

18

soil as clean soil. Plaintiff and others were denied the right to bid on transporting such fill to the East Parcel.

i) After Plaintiffs were interviewed by state and federal officials concerning the improper bidding practices of the SHLDC, the members of the SHLDC and the Philips Manor Enterprises, advised companies that were awarded contracts by the Village and/or the SHLDC that they could not use Plaintiffs as a supplier or subcontractor if they wanted to do business with the SHLDC or the Village;

j) Members of both Enterprises would also tell village employee and the heads of Village departments, not to purchase from Plaintiffs after Plaintiffs were interviewed by state and federal officials.

k) Each member of the Enterprises willfully engaged in this conduct with actual knowledge of the purposes, goals and illegal activities of the Enterprise.

AS AND FOR A FIRST CAUSE OF ACTION
RICO Violation Against Schroedel, HMC Giaccio, Leavy, Cortese and Cortese Corp. for violation of 18 USC 1961 et seq

66.    Beginning on or about January of 2017 if not earlier, Schroedel, Giaccio and Leavy began to run the affairs of the SHLDC Enterprise through a pattern of racketeering activity and for the unlawful purposes of intentionally defrauding Plaintiffs (and others) by acts, including, inter alia, directing funds of the SHLDC to preferred contractors and away other persons, including Plaintiffs. These actions would be the proximate cause of economic injury to the Plaintiffs. Ultimately, the members of the Enterprises would seek to retaliate against Plaintiffs for speaking to federal authorities about the bid rigging that was being

conducted by the SHLDC in order to ruin Plaintiffs financially and for the personal, pecuniary and political advantage of themselves.

67.    Beginning on or about April of 2017, Schroedel, Giacco and Leavy would also establish the Philips Manor Enterprise and with the assistance of and Cortese, and utilizing HMC and Cortese Corp. would conduct it activities through a similar pattern of racketeering activity and for the unlawful purposes of intentionally defrauding Plaintiff (and others) by acts, including, inter alia, directing funds of the SHDC to preferred contractors and away other persons, including Plaintiff, for the personal, pecuniary and political advantage of themselves.

68.    The injuries to the Plaintiffs were caused by the Defendants' commission of one or more of the predicate acts as defined by 18 USC 1961 (1) (A) and (B).

69.    Each of the individual defendants Schroedel, Giaccio, Leavy and Cortese is a RICO person pursuant to 18 USC 1961 (3).

70.    Each of the two corporate entities, HMC and Cortese Corp. is a RICO person pursuant to 18 USC 1961 (3).

The First Scheme to Commit Fraud and Engage in Bribery by Schroedel, Giaccio, Leavy, HMC, Cortese and Cortese Corp. in awarding the May 2018 Bid

20

71.    The acts set forth below constitute a pattern of racketeering activity pursuant to 18 USC 1961 (1) (A) by engaging "in any act or threat involving … bribery".

72.    Commercial bribery in violation of New York Penal Statute 180.08 when an employee, agent or fiduciary without the consent of his employer or principal, "solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs, when the value of the benefit solicited, accepted or agreed to be accepted exceeds one thousand dollars and causes economic harm to the employer or principal in an amount exceeding two hundred and fifty dollars."  It is also a violation of New York Penal Law 200.10, to the extent that any of the Defendants were public officials.

73.    Violation of either statute is a felony, punishable by imprisonment for more than one year.

74.    Such acts of bribery are, by definition, racketeering activity under 18 USC 1961 (1) (A).

75. By April of 2017, Schroedel (and using HMC) with Giaccio and Leavy, pre-determined to make sure that site improvements in 2017-2018 on the East Parcel would be done by Cortese and/or Cortese Corp. and no one else.

76. Cortese and Cortese Corp., operating directly or through their connections with Stiloski Automotive Corp., on information and belief, provided benefits to Schroedel, Giaccio, Leavy and others, including providing free service (or greatly reduced service) on the cars owned by Schroedel, Giaccio, Leavy and others or direct benefits, in the form of cash to Schroedel, Giaccio and Leavy, to have Schroedel, Giaccio and Leavy direct certain site work on the East Parcel to Cortese Corp.

77. Schroedel, Giaccio and Leavy accepted such benefits and bribes, and on information and belief, this was done without the consent of SHLDC (their principal) or the Village. Such bribes were accepted upon an agreement or understanding that such actions would influence their conduct in relation to the affairs of their principle SHLDC, specifically making sure Cortese and/or Cortese Corp were awarded work at the East Parcel, regardless of the bidding process.

78. The bribes or other benefits conferred by Cortese or Cortese Construction on the other members of the Enterprises did in fact result in Plaintiffs

22

not being awarded the May 2017 contract to do temporary site work on the East Parcel.

79. On May 22, 2017, Schroedel, acting in individually and in his capacity as the owner of HMC,  orally announced at a evening meeting of the SHLDC (attended by Dibble, but not Cortese) that he would seek bids for such temporary site work on the East Parcel for a period of thirty days (the "May, 2017 Bid"). Such announcement was false when made and known by Schroedel to be false when made as Schroedel has already determined that Cortese and Cortese Corp. would receive the bid.

80. No Request for Proposals ("RFP") was issued nor was any written public announcement issued that bids were being solicited for the temporary site work on the East Parcel, despite the fact the work would clearly involve amounts in excess of $35,000.00.

81. Rather, on information and belief, Schroedel on or about May 23, 2017 called Cortese on the phone or communicated by other electronic means with Cortese and requested Cortese and/or Cortese Corp. prepare a bid, after he had received from Dibble first the parameters of Plaintiffs bid. The information in Plaintiff's actual bid would be subsequently communicated to Cortese as well once received.

82. Schroedel never revealed to Plaintiffs whether SHLDC would require one operator or two to do the work encompassed by the May 2017 Bid and was only orally advised to submit a bid a few days after the meeting while at the same time told, he probably won't get the award.

83. Dibble was the only person who submitted a bid to do the work with one operator.

84. On information and belief, in addition to providing Cortese with the information on the Dibble bid, Schroedel and/or Cortese, to further create the illusion that there was a bidding process in place, asked and got Earth Improvements (another company, owned by a relative of Cortese) to submit a "cover bid" that would be higher than Cortese Corp Bid) to create an impression of competitive bidding when there was, in reality, a pre-determined decision to award the bid to Cortese Corp.

85. Cortese, through Cortese Corp., submitted a bid for doing the work with two operators, without providing any equipment without cost and without providing any details on how he came up with a number that was $50.00 less that Plaintiff's bid for two operators which did provide equipment without cost) and not providing a bid for one operator.  The bid was also back dated to May 22, 2017,

the day of the "night meeting", when Schroedel announced he would be seeking

bids and after he had solicited the range of the bid Dibble was likely to submit.

86.  As a result of such request, Earth Improvements submitted a cover bid

to do the work with two operators, without calculations, that was higher that the

Cortese Corp. bid.

87.  The work that would be done, under the May 2017 Bid was primarily

done with one operator, as Dibble had anticipated, thus costing the SHLDC more

to use Cortese Corp than Plaintiffs.

88.  Schroedel misrepresented to Dibble and others that Plaintiffs were not

the low bidder.

89. In fact. Plaintiffs were the only ones to have submitted a bid to do the

work with one operator which was far lower that the Cortese bid and was also

lower if two operators were used, as Plaintiffs bid agreed to supply two pieces of

equipment, without charge.

90. Even though Plaintiffs were the low bidder, Schroedel and Giaccio

caused the May 2017 Bid to be awarded to Cortese Corp. as had already been pre-

determined.

91. Cortese Corp. would eventually bill the SHLDC for approximately $140,000 of work, which would have been Plaintiff's had the bid been properly awarded. As a direct result of not being awarded the low bid, Plaintiffs were damaged in the amount of that he would have billed SHLDC, for the same work, but using primarily one operator, in an amount of approximately $100,000.00.

92. Schroedel would later claim that the reason the job was not awarded to Dibble was because of the complaints and actions by McGovern a member "at large" of the Beach Club who had direct connections with John Leavy, an officer of the Beach Club and a member of the Enterprises.

93. Each of the participants in this bribery scheme had knowledge of the existence of the Enterprises and the nature of the activities of the Enterprises at the time they engaged in the activity of taking, soliciting or delivering the bribe. The actions taken by Schroedel (directly or through HMC), Giaccio and Cortese (directly or through Cortese Corp.) were the direct and proximate cause of Plaintiffs not being awarded the May, 2017 bid, and caused a loss to the Plaintiff, property within the meaning of 18 USC 1964 (c), in an amount believed to be in excess of $100,000.00.

<u>Second Scheme by Schroedel, Giaccio, Leavy, HMC, Cortese and Cortese Corp. to commit wire and/or mail fraud in violation of 18 USC 141 and 1343 By Schroedel, HMC, Giaccio, Leavy and Cortese and bribery in violation of 18 USC 1961 with respect to bringing fill to the East Parcel</u>

94. On or about the beginning of 2017 the SHLDC sought bids, this time by issuing an RFP for contractors to bring in clean fill to the East Parcel from a DEP site located in Valhalla, New York.

95. On information and belief, some copies of the RFP were mailed across state lines to contractors in New Jersey and Connecticut.

96. The SHLDC did not put out an RFP for recycled material "recycled material"), representing the SHLDC was only interested in clean fill from a specific DEP site for the East Parcel.

97. Plaintiff and others were denied the right to bid to move recycled material from other sites as Schroedel and Giaccio had represented they were only interested in clean fill from the DEP, not recycled fill.

98. In addition, since the cost of bidding on the moving of any fill would also open up the opportunity to provide site work to properly move the fill once deposited on the East Parcel, a contractor such as Plaintiff would be in a position to offer both services if provided with the opportunity to bid on such work.

99. Neither Plaintiff nor any other contractor submitted a bid to truck recycled material, since Schroedel Giaccio and Leavy only produced a REP for the cost to bring in clean fill from a specific DEP location.

100. In late June or early July of 2017, Schroedel contacted an individual believed to be Josh Ford of Ridgewood, New Jersey, using interstate mail and/or wire transactions.[1]

101. On information and belief, Josh Ford put Schroedel in contact with trucking companies in New Jersey, including Grid Logistics of Kearney, New Jersey, to pick up the alleged recycled fill in Queens County, New York from Durante Brothers.

102. The New Jersey companies had their truckers travel to Queens County, New York, to pick up what was supposed to be recycled material from a company owned by Durante Brothers.

103. At the time this was done, Schroedel continued discussions with contractors who had put in bids to deliver clean fill, without advising them, or Plaintiffs, that he was also willing to take recycled materials from other locations.

---

[1] Plaintiffs were not parties to these conversations so more definite dates would require additional discovery.

104. On information and belief, neither Schroedel (or HMC), Giaccio

Cortese (or Cortese Corp.) or Leavy made any effort to independently verify that

the recycled materials had in fact been recycled to remove contaminates, despite

Schroedel, Giaccio and Leavy having appointed the SHLDC as the lead

environmental agency to monitor the compliance of SHLDC with environmental

laws.

105. On information and belied, Schroedel. Giaccio and/or Leavy make no

effort to advise the contractors who had provided bids for moving clean soil, that

they could amend their bid to bid on moving recycled material from other

locations.

106. Bringing untested recycled materials to the East Parcel, would put a

cost to the SHLDC or the Village for cleaning recycled material,  much in the same

way that the SHLDC would pick up the costs of cleaning material dredged from

the Hudson River by the Beach Club (of which Wray, Schroedel and Leavy were

members) and deposited at the East Parcel. Cortese Corp would be paid to clean

contaminated material.

107.  The fact that such recycled materials could be contaminated was

known or should have been known the members of both Enterprises since recycled

materials often consist of contaminated materials. In this case, at approximately the

same time Schroedel was communicating with companies in New Jersey to pick up recycled materials from the Durante Brothers in Queens, Durante Brothers came under investigation and was eventually indicted by the District Attorney of Suffolk County for selling recycled contaminated materials as clean recycled materials.

108. At approximately the same time as Schroedel began to contract with companies in New Jersey to pick up the recycled materials from the Durante Brothers, Schroedel also began to utilize a 2017 Lincoln, license plate HUE-8595, which, on information and belief, was unregistered and insured by the SHLDC. On information and belief, the use of the car was part of the bribes given to Schroedel, to use the New Jersey truckers as opposed to other bidders and/or not to run any tests for contamination on the material being moved. The use of such car, for a period of at least a year, was a benefit to Schroedel of more than $1,000.00.

109. Schroedel accepted this car, and/or its use, without advising the SHLDC or the Village, that he was accepting the offer of truckers from New Jersey, without issuing a RFP, for removing fill from the site owned by Durante Brothers and without arranging for testing the materials before they left Queens or after they arrived at the East Parcel.

110.  On information and belief, the materials delivered to the East Parcel from the Durante Brothers have not been independently tested, or if they were, the SHLDC has refused to release such tests and contain contaminated materials.

111. As a result, the cost of cleaning such materials if they are contaminated would be a cost to the SHLDC and or the Village, and such cost would exceed $1,000.00.

112. These acts constitute a pattern of racketeering activity pursuant to 18 USC 1961 (1) by engaging in any act or threat involving … bribery" in violation of New York Penal Statute 180.08 where an employee, agent or fiduciary without the consent of his employer or principal, "solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs, when the value of the benefit solicited, accepted or agreed to be accepted exceeds one thousand dollars and causes economic harm to the employer or principal in an amount exceeding two hundred and fifty dollars" as well as a violation of New York Penal Law 200.10, to the extent that any of the Defendants were public officials.

113. Violation of either statute is a felony, punishable by imprisonment for more than one year.

114. Such acts of bribery are, by definition, racketeering activity under 18 USC 1961 (1).

115. Giaccio, as the chief executive office of the SHLDC, authorized the fill to be picked up by the New Jersey trucker and to be delivered to the East Parcel without an RFP and without testing, and on information and belief, this was done to assist Schroedel in keeping the bribe he was receiving from being uncovered. Cortese (through Cortese Corp), similarly, would seek to spread this material around the East Parcel to diminish the opportunity it would be found to be contaminated and thus expose the bribe to Schroedel.

116. In an effort to explain away their failure to offer this work pursuant to an RFP, Schroedel and Giaccio represented the fill being brought in was clean fill, that had been tested.

117. At the time such representation was made, Schroedel and Giaccio knew or should have known, such fill was likely to be contaminated and had not been independently tested.

118. By misrepresenting the type of material that they were seeking by misrepresenting that material could only come from a DEP location, Schroedel and Giaccio denied Plaintiff (and others), who relied on the misrepresentation they

only wanted clean fill from a specific DEP location, the right to bid on delivering recycled materials or to offer to move such materials from other locations.

119.  Plaintiffs (and other contractors) could reasonably expect to receive approximately $400.00 per truck load from either the supplier or the recipient (or a combination if both) to move such materials which on information and belief, is the amount the New Jersey truckers received. Based on the amount of fill that was being transported, which would have exceeded 300 truckloads over a period of several months.

120.  As a direct and approximate result of, and by reason of, this pattern of racketeering, Plaintiffs have been injured in their business or property with the meaning of 18 USC 1964 (c) in an amount not presently known but believed to be in excess of $60,000.00.

121. This scheme was also a violation of 18 USC 1343 (and possibly 1341), as the fraud that was perpetuated on the Plaintiffs and other contractors by asking them to limit their bids to a specific location and by misrepresenting the nature of the material that was eventually brought to the East Parcel, a fraud that was advanced through the use of phone or e-mail communications, both with Josh Ford and the New Jersey trucking companies.

122. This scheme was related to the earlier scheme in that it had the same purposes (to deny work to those not favored by the members of the Enterprises), results (it did in fact deny those not favored by the members of the Enterprises even the opportunity bid), the participants (Schroedel and by extension, HMC, Giaccio and Cortese and by extension Cortese Corp) were the same and victims (Plaintiffs and other contractors) were the same.

123.  The actions taken by Schroedel (HMC), Giaccio and Cortese (Cortese Corp.) were the direct and proximate cause of injury to Plaintiffs property within the meaning of 18 USC 1964 (c) for not having the opportunity to move the recycled material from Queens, at a loss of $400.00 per truck loan, at loss believed to be in excess of $120,000.00.

<u>Third Scheme by Schroedel (HMC), Giaccio, Leavy and Cortese (Cortese Corp) an act of bribery in violation of 18 USC 1961 and destruction of records in violation of 18 USC 1512 concerning bidding for fill management services at the East Parcel</u>

124.  In June of 2018, Dibble, by letter and by appearing before the Village trustees, attempted to bring the irregularities in the bidding process to the attention of the Village.

125. After Dibble brought the irregularities in the bidding process to the attention of the Village, on or about June 20, 2017, Wray advised Dibble that he

would appoint a committed to investigate and make recommendations on the bidding practices used by the SHLDC.

126. On information and belief, such committee never met and if it ever met, did not investigate the bidding process, never issued any report and the primary purpose of making such representation was to mislead Plaintiffs that actions were being taken to prevent similar pre-determined contact awards.

127. During the period from late June to late July of 2017, Schroedel, Giaccio and Leavy, and others represented to Dibble that procedures had been put in place to avoid any appearance or occurrence of collusive bidding but failed to provide any evidence of such new procedures.

128. Such representations were false when made and known by Schroedel, Giaccio and Leavy to be false when made.

129. During the same period, aware that Dibble might be considering legal action, Dibble was warned by members of the Enterprises and other Village officials that he should not speak to lawyers, newspapers or government investigators or the SHLDC and/or the Village would retaliate.

130. On or about July 22, 2017 Plaintiff Dibble was interviewed by state law enforcement officials concerning the irregularities in the bidding practices of the Village and the SHLDC.

131. That fact that State law enforcement officials were speaking to Dibble was known to Schroedel, Giaccio, Leavy, Cortese and others.

132. On or about October 18, 2017, the SHLDC issued an RFP for fill management services at the East Parcel Development Project, known as RFP 101817.

133. On information and belief, REP 101817 was distributed through the mails. It was, however, deliberately made confusing as to the scope of the work to be done so as to discourage any bidders other than the contractor that had been pre-designated by Schroedel and Giacco as to the contractor to get the award, which was Cortese and/or Cortese Corp.

134.  Despite the confusing nature of the RFP, Plaintiffs, familiar with the East Parcel site and the general parameters of the work likely to be required, and relying on the representations of Schroedel, Giaccio, Leavy and Wray that procedures had been implemented to make sure bids were properly submitted,

36

submitted a bid timely on November 9, 2017. In accordance with the bid instructions, the bid was submitted in a properly sealed envelope.

135. No other bids had been submitted when the deadline came and went.

136. Within a few minutes after Dibble had timely submitted his bid, but before the time to submit bids expired, an employee of SHLDC suddenly left the offices of the SHLDC.

137.    On information and belief, the employee had Karl Dibble's bid in the possession of the employee and got into a car that was outside the building and met with an individual believed to be Nicholas Sirriah, an employee of Cortese Corp.

138.    On information and belief, these actions were taken on the instructions of Schroedel and/or Giaccio to alert Cortese and Cortese Corp. to get its bid in before the deadline and to be given details of the Plaintiffs' bid.  Cortese Corp. would have been contacted to come to the offices of SHLDC using phones or other electronic devises to advance the racketeering activity.

139.    While Karl Dibble waited in the office of the SHLDC, Giaccio, came into the hallway and remained there. It would shortly become apparent that he was waiting for the arrival of the representative from Cortese Corp.

140.    Approximately five minutes after 10:00 AM, Nicholas Sirriah entered the building and walked toward Mr. Giaccio, who took from him an unsealed folder filled with documents.

141. The folder was identified by Mr. Giaccio as having a bid in it by Cortese Corp. for the work known as REP 101817.

142.    This bid by Cortese Corp. was not in a properly sealed envelope as required by REP 101817.

143.    The bid by Cortese was also submitted after the time for submitting bids for REP 101817 had expired, knowing that it was a late and improperly submitted bid.

144.    Dibble promptly protested that the SHLDC could not accept the bid that was not properly submitted and submitted late and contacted the Village police, who were in the same building, to witness what was now yet another attempt to make sure that Cortese Corp. was awarded a bid, this time for REP 101817, despite the previous representations made that procedures had been put in place to ensure the bidding process was not rigged and the violation of the bid instructions.

145.  Dibble was told by Giaccio that Giaccio was not accepting the bid delivered by Mr. Sirriah but did not hand the Cortese Corp folder which contained the Cortese Corp. bid back to Sirriah.

146.  Giaccio also told Dibble that he <u>may</u> not accept Plaintiff's bid either.

147.  No reason was given at that time or thereafter, why Dibble's timely and properly sealed bid might not be accepted.

148.  Giaccio, while retaining the Cortese Corp bid, refused the request by Dibble to open the folder given to him by Sirrah to confirm that Sirrah (or Cortese Corp.) had not been shown Dibble's bid prior to the belated submission of the Cortese Corp. bid.

149.  Dibble was subsequently told the Cortese Corp bid had been destroyed by Giaccio or those in his office at his direction.  On information and belief, Cortese also destroyed any bid documents Cortese Corp had prepared with respect to this bid.

150.  On information and belief, Schroedel and Giaccio also had the films in the security cameras in the building at the time in question destroyed and/or withheld from Plaintiffs when they sought the same under the Freedom of Information Act.

151.    Although Plaintiff's had the lowest and only bid for the work, the contract was yet to be awarded and at no point was Dibble ever advised that Plaintiff's bid had not been accepted or that the request for bids had been withdrawn.

152.    On information and belief, the reason Plaintiffs were not awarded the contract was due to bribes, including bribes they had previously received and additional bribes that they had been promised and/or delivered by Cortese or those acting on his behalf.

153.    These acts constitute a pattern of racketeering activity pursuant to 18 USC 1961 (1) by engaging in any act or threat involving ... bribery" in violation of New York Penal Statute 180.08 which an employee, agent or fiduciary without the consent of his employer or principal, "solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs, when the value of the benefit solicited, accepted or agreed to be accepted exceeds one thousand dollars and causes economic harm to the employer or principal in an amount exceeding two hundred and fifty dollars as well as a violation of New York Penal Law 200.10, to the extent that any of the Defendants were public officials.

154.    Violation of either statute is a felony, punishable by imprisonment for more than one year.

155.    Such acts of bribery are, by definition, racketeering activity under 18 USC 1961 (1).

156.    In addition, the destruction of the Cortese bid constituted a pattern of racketeering activity pursuant to 18 USC 1512 (b) (2) (B) when anyone "corruptly persuades another person... to cause or induce any person to alter, destroy, mutilate, or control an object with intent to impair the object's integrity or availability for use in an official proceeding."

157.    Violation of such statute is a felony, punishable by imprisonment of more than one year.

158.    Such acts of destroying objects to prevent their availability for use in an official proceeding is racketeering activity under 18 USC 1961(B).

159.    REP 101817 was a contract to manage fill at the East Parcel.  It had already been announced, that in order for the East Parcel to be utilized for the purposes intended, additional material, fill and or soil, had to be brought in and managed in such a fashion as to raise the surface level of the entire approximately 29 acres of the East Parcel (approximately 140,360 square yards) a height of at

least twelve feet (or four yards) and which would require the management of more than 550,000 cubic yards of materials. At a minimum cost of $10.00 for each cubic yard managed, the loss to Plaintiffs would be in excess of $5,000,000.00 and the loss to the SHLDC and/or Village would certainly have exceeded $1,000.00 and the amount of the bribe would certainly have exceeded $1,000.00.

160.   This scheme was related to the earlier scheme in that it had the same purposes (to deny work to those not favored by the members of the Enterprises), results,  the participants (Schroedel, Giaccio and Cortese) were the same and victims (Plaintiffs and other contractors) were the same). The loss of the bid to the Plaintiffs was the direct and proximate cause of the loss of property within the meaning of 18 USC 1964 (c) and an amount in excess of $5,000,000.00

Fourth Scheme by Schroedel, HMC, Giaccio, Leavy, and Cortese and Cortese Corp. to retaliate against a victim or informant in violation of 18 USC 1513 (e).

161.   On May 5, 2018, Dibble was interviewed by William McRogan of the Federal Bureau of Investigation and two other agents on the bidding practices of the SHLDC. During the interview, Dibble provided such agent with truthful information about the bidding practices of the SHLDC relating to the commission or possible commission of federal and/or state offenses, such as using the mails and electronic communications to further a fraud and/or bid rigging.

162.    Defendant Schroedel, Giaccio, Leavy, Cortese and other members of both Enterprises were aware that law enforcement officers had contacted Dibble about possible federal and state offensives involving fraudulent communications and bid rigging.

163.    The members of both Enterprises, did in fact, seek to retaliate against Plaintiffs for speaking to law enforcement officers about the commission or possible commission of federal offenses involving their collusive bid rigging efforts and other actions to interfere with Plaintiff's livelihood.

164.    In the Spring of 2018, Plaintiffs were contacted by Katarzyna Arencibia, for the purpose of acquiring materials from Plaintiffs for use on a project on the Riverwalk project in the Village, which had been awarded to her or where she was a subcontractor of Landi Contracting Inc., to supply materials to her for the project.

165.    After Dibble spoke to the FBI, Ms. Arencibia advised Dibble that she had been told by Leavy that the Village would not let her use the Plaintiffs to supply materials.  On information and belief, Leary took this action with the knowledge and on instructions of Schroedel and Giacco.  Cortese similarly had knowledge of this action, having already terminated any business dealings with

Plaintiffs and, on information and belief, encouraged other private contractors not to utilize Plaintiffs.

166.   On information and belief, this was an act in retaliation for Dibble having spoken to law enforcement officers about possible federal and state violations regarding the SHLDC and Village bidding practices. This action by Leavy was the cause of Plaintiffs not receiving the order for supplies and causing them injury to their business or property within the meaning of 18 USC 1964 (c) in an amount not presently known but believed to be in excess of $10,000.00.

167.   Leavy, was aware of the prior predicate acts of the other members of the Enterprises and that he was actively discouraging the use of the Plaintiffs as suppliers to independent contractors that had been using Plaintiffs for supplies and service, to further the purposes of the Enterprises. On information and belief, such information was given to other independent contractors that did or desired to do business with the Village and/or the SHLDC.

168.   On information and belief, the Village never passed any formal resolution forbidding independent contractors, who were work for the Village, to use Dibble for supplies or service. Such actions by Leavy, to represent that the Village had decided not to use Plaintiffs, were taken by the members of the

44

Enterprises to retaliate against Plaintiffs for speaking truthfully to federal authorities and for the specific purpose of causing economic harm to the Plaintiffs.

169.    An act of retaliation against an individual who has spoken to federal authorities is a predicate act under RICO as 18 USC 1513 (e) specifically provided that "Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both."

170.    This scheme was related to the earlier schemes in that it had the same purposes (to deny work to those not favored by the members of the Enterprises), results,  the participants (Schroedel, Giaccio and Cortese) were the same and victims (Plaintiffs and other contractors) were the same).

Fifth Scheme by Schroedel, Giaccio, Leavy and Cortese to retaliate against a victim or informant in violation of 18 USC 1513 (e).

171.    In the Fall of 2018, Plaintiffs were advised that Giaccio's office and told Village employees (as opposed to independent contractors), that purchases by the Village for fall decorations in the Village, that traditionally had been purchased from the Plaintiffs, needed to be acquired from some other supplier.

45

172.   On information and belief, the Village never passed any formal resolution not to use Plaintiffs for supplies for Village fall decorations and such actions, were taken by the members of the SHLDC Enterprise and the Philips Manor Enterprise, specifically Schroedel, Giaccio and Leavy, acting on their own as an act of retaliation against Plaintiffs for having spoken truthfully to federal officials about their bid rigging efforts and to cause Plaintiffs economic harm.

173.   An act of retaliation against an individual who has spoken truthfully to federal authorities is a predicate act under RICO as 18 USC 1513 (e) specifically provided that "Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both."

174.   The fall decoration purchases traditionally ran between $15,000 and $20,000 a year and Plaintiffs were damaged by the direction to Village employees not to use Plaintiffs, who were located in the Village, and instead travel to another municipality to purchase such items.

175.   This scheme was related to the earlier schemes in that it had the same purposes (to deny work to those not favored by the members of the Enterprises), results, the participants (Schroedel, Giaccio and Leavy) were the same and victims (Plaintiffs) were the same).

176.   On information and belief, Giaccio in giving such instructions, was acting with the knowledge and approval of Schroedel, Leavy and Cortese, who approved such actions as they would advance the purposes of the Enterprises.

177.   On information and belief, this was an act in retaliation for Dibble having spoken to law enforcement officers about possible federal and state violations regarding the SHLDC and Village bidding practices. This action was the cause of Plaintiffs not receiving the order for supplies and is the direct and proximate cause of injury to Plaintiffs property within the meaning of 18 USC 1964 (c) in an amount not presently known but believed to be in excess of $15,000.00.

178.   On information and belief, the Village never passed any formal resolution forbidding employees of the Village from purchasing fall decorations from Plaintiffs. Such actions by Schroedel, Giaccio and Leavy, to represent that the Village had decided not to use Plaintiffs, were taken by the members of the

Enterprises to retaliate against Plaintiffs for speaking truthfully to federal authorities and for the specific purpose of causing economic harm to the Plaintiffs.

179.   This scheme was related to the earlier schemes in that it had the same purposes (to deny work to those not favored by the members of the Enterprises), results, the participants (Schroedel, Giaccio and Leavy) were the same and victims (Plaintiffs) were the same.

Sixth Scheme by Schroedel, HMC, Giaccio, Leavy, and Cortese to retaliate against a victim or informant in violation of 18 USC 1513 (e).

180.  On or about June of 2018, Plaintiffs inquired of the Department of Public Works, why emergency equipment rentals, such as trucks for paving roads or the removal of snow from Village streets, which he had traditionally been awarded to a significant extent, had dropped to a small fraction of what it had previously been.

181. Plaintiff was advised by the Department of Public Works, that the Village (Schroedel, Giaccio and Leavy) directed them to make the switch to satisfy certain "union elements".

182. On information and belief, such representation was made to the Department of Public Works by Schroedel, Giaccio and Leavy, was false when made, known by the members of the Enterprises to be false when made and was

48

made willfully and intentionally to hide the fact that they, and other members of the Enterprises were retaliating against Plaintiffs.

183.    At the time these representations were made, the work that had previously gone to Plaintiffs, was going to contractors who did not employ union workers.

184.    On information and belief, the Village never passed any formal resolution requiring the Village DPW to reduce and/or eliminate using Plaintiffs, nor received any demand from unions to move such work to union companies and such actions, were taken by the members of the SHLDC Enterprise and the Philips Manor Enterprise, specifically Schroedel, Giaccio and Leavy, acting on their own as an act of retaliation against Plaintiffs for having spoken truthfully to federal officials about bid rigging and to cause Plaintiffs economic harm.

185.    An act of retaliation against an individual who has spoken truthfully to federal authorities is a predicate act under RICO as 18 USC 1513 (e) specifically provided that  "Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal

offense, shall be fined under this title or imprisoned not more than 10 years, or both."

186.   This scheme was related to the earlier scheme in that it had the same purposes (to deny work to those not favored by the members of the Enterprises), results, the participants (Schroedel, Giaccio and Leavy) were the same and victims (Plaintiffs and other contractors) were the same.

187.  This act of retaliation and is the direct and proximate cause of injury to their business or property within the meaning of 18 USC 1964 (c) in an amount not presently known but believed to be approximately $25,000 in 2018 and $10,000, thus far, in 2019.

188. The actions by Schroedel, Giaccio and Leavy continue and are likely to continue in 2019 and at least through 2026, the year when the development of the site on which the SHLDC was given control was promised to be completed.

189.  This scheme was related to the earlier schemes in that it had the same purposes (to deny work to those not favored by the members of the Enterprises), results,  the participants (Schroedel, Giaccio and Leavy) were the same and victims (Plaintiffs) were the same). Such actions were taken with the knowledge and approval of Cortese.

190.   All these schemes are continuing.  To date, no contractor other than Cortese Corp. has been used to manage fill at the East Parcel site. While members of the Enterprises and those who have acted for it, continue to seek to persuade long time customers of the Plaintiffs to use other contractors not located in the village.

## AS AND FOR A SECOND CAUSE OF ACTION
Collusive Bidding, Bid Rigging in Violation of the Sherman Anti-trust Act 15 USC Sec 1-38 against Schroedel, HMC, Giaccio, Leavy, SHLDC, Wray, Cortese, Cortese Corp and Earth Improvements

191.   Plaintiff repeats and realleges each and every allegation in paragraphs 1 to 190.

192.   Defendants Schroedel, HMC, Giaccio, Leavy, SHLDC, Wray, Cortese, Cortese Corp and Earth Improvements knowingly formed a conspiracy that was in existence before or about the time of the bid that is the subject of this cause of action.

193.   Each of the defendants, against which this cause of action is alleged, voluntarily and knowingly joined the conspiracy alleged and have continued to be a part of the conspiracy since its formation.

194.   The conspiracy was one to rig and/or assist in the rigging of bids in the Village of Sleepy Hollow and to the SHLDC.

195.   Bid rigging is a per se unreasonable restraint on trade and a violation of the federal anti-trust laws (15 USC Sec 1-38).

196.   The conspiracy to rig the bids set forth in this cause of action substantially affected interstate or foreign commerce or occurred within the flow on interstate or foreign commerce.

197.   As part of the conspiracy, Schroedel, (and through him HMC) Giaccio, Leavy and Wray (and through them SHLDC) arranged that only contractors selected by them would receive contractual awards from the Village and/or the SHLDC with respect to competitive bids in the Village of Sleepy Hollow in general and on the East Parcel in particular.

198.   On or about May 22, 2017, the SHLDC sought bids to stockpile fill being delivered to the East Parcel. Plaintiffs were requested to advise the SHLDC at a meeting that night what the approximate price would be for Plaintiffs to stockpile and manage the fill. No other contractor was asked to reveal the parameters of their expected bid.

199.   On information and belief, Schroedel, HMC, Giaccio, Leavy, SHLDC, and Wray had already pre-determined that the contract would go to Cortese Corp. and the bidding process was simply a formality they would go through to give the appearance of a doing matters legally.

200.   To make sure that the number of bids that might be submitted would be limited and the contract would be awarded as pre-determined, to Cortese Corp, no public announcement of seeking the bids was made by Schroedel, HMC, Giaccio, Leavy, Wray or the SHLDC.

201.   Similarly, to make sure that the number of bids would be limited, and the contract would be awarded as pre-determined no Request for Proposals ("RFP") was issued by Schroedel, HMC, Giaccio, Wray, Leavy or the SHLDC.

202.   As a result of Schroedel, HMC, Giaccio, Leavy Wray and the SHLDC making sure the information on the availability of the work was essentially a) kept out of the public domain; and b) the scope of the work was sufficiently vague so as to deter bidders who might learn about it (such as the number of workers and machines that would be needed on a regular basis, the amount of soil that needed to be managed), the number of potential bidders that could compete for the work was limited by design.

203.   It was the intention of Schroedel, HMC, Giaccio, Leavy. Wray and the SHLDC to limit competition for this work and in accordance with their conspiracy.

204.   Schroedel, HMC, Giaccio, Leavy, Wray of the SHLDC were all aware, that due to Dibble's knowledge of the East Parcel, that Plaintiffs were the only possible entity that would likely submit a competitive bid that would be lower than the pre-determined winner of the award, Cortese Corp.

205.   Based on experience with Plaintiffs, defendants were also aware that the bids by Plaintiffs were normally much lower than other responsible bidders and thus Plaintiffs would likely submit a bid that would be lower than Cortese unless steps were taken to rig the bids.

206.   On or about May 24, 2017, having already gotten the parameters of Plaintiffs bid from Dibble, Schroedel then asked Dibble to provide a written bid. This was done without providing any further outline of the scope of the work to be performed, the procedure the SHLDC intended to follow or issuing a Request for Proposals. No deadline for submitting bids was ever announced.

207.   Not even cosmetic precautions to ensure the bidding process would be run fairly, such as requiring bids to be time stamped as and when submitted or

submitted in sealed envelopes, were put in place. In fact, the process was set up so that Schroedel, or other members of the conspiracy, or individuals acting on their behalf, would be able to share the information in one bid, with other bidders, before the bidding process was closed.

208.   Schroedel revealed the intention of the conspirators to have pre-determined the winner of the award by advising Dibble on or about May 24, 2017, before Dibble had even submitted his bid, that "you probably won't get the job".

209.   Nor revealed to Plaintiffs, was that Schroedel and the other members of the conspiracy had already determined to award the contract to Cortese.

210.   Despite being discouraged from bidding (which would have advanced the purpose of the Enterprise), and without knowing the full scope of the work to be done, Plaintiffs provided an estimate, with two options, one using a single operator for the work at a cost of $1,125.00 a day, and one using two operators at a cost of $2,250.00 a day.  Both estimates provided for the use of a loader and a sweeper without charge.

211.   On information and belief, Mr. Schroedel passed the information in the Plaintiff's bid to Andrew Cortese, the owner and/or operator of Cortese Construction. On information and belief, Cortese then back dated an unsigned

proposal, to May 22, 2017. If done on that day during business hours, it would pre-date the statement by Schroedel, that night when he first announced he would seek bids. Cortese's bid removed the itemization of costs as to how he to reach the "bottom line".

212.   The bid submitted by Cortese for using two operators was $50.00 less, than Plaintiffs proposal for two operators only if the if the cost of the loader and sweeper were not considered, in which case, Plaintiffs proposal was lower. The Cortese bid was significantly higher than the bid Plaintiffs submitted for doing the same work with one operator.

213.   As events would unfold, most of the days the Cortese worked on the East Parcel under this contract, Cortese used only one operator, or had a second employee on the location when one was not needed, and charged for the use of a loader and sweeper when it was utilized.

214.   On information and belief, Schroedel and/or Cortese, then requested a cover bid from Earth Improvements Inc., a company that was owned and/or operated by Tony Raconelli, a cousin Cortese, who submitted a "cover" bid, also without details, that was higher than the bid submitted by Cortese.

215.   The work being sought was more than thirty-five thousand dollars and yet was not offered to the public by public notice, nor was a time provided for submission of the bids, nor were the bids required to be sealed allowing Schroedel and others to know what Dibble's bid was before the other bids were submitted) nor a time given for the opening of the bids, all in violation of Public Municipal Law 103.

216.   The manner in which the bid was offered, without public notice, without being sealed and without a deadline for submission, was designed to keep bids limited and to eliminate competition from other bidders and to make sure Plaintiffs bid was known in advance so that such information with respect to his bid was available to Schroedel and the other members of the conspiracy before the bids were "opened".

217.   The manner in which the bids were solicited from Cortese and Earth Improvements constituted bid rigging, in violation of federal law (Sherman Anti-Trust act as amended 15 USC Sec 1-38) and state law (General Business Law Sections 340-347) which prohibit, inter alia, price fixing and bid rigging, which includes arranging bids so as to eliminate completion.

218.    Once the bids were made public, Dibble brought the improprieties to the attention of the Village of Sleepy Hollow by addressing them directly in June of 2017 and by letter in July 2017 specifically to Wray.

219.    In June of 2017, it was announced Cortese would be awarded the contract on the its unsigned "bid" that had never been properly presented.

220.    The Defendant Wray represented to Dibble that he would appoint a committee to look into the matter and do an investigation.

221.    On information and belief, the "committee" if one was appointed, held no meetings and issued no reports.  On information and belief, the real purpose of the committee Wray allegedly set up was to persuade Plaintiffs not to continue their inquiry into the rigged bidding process.

222.    In furtherance of that purpose, in the middle of June, 2017, Schroedel, Giaccio, and eventually Glen Rosenbaum (Deputy Mayor of the Village) and Mike Dowley (Chairman of the SHLDC), contacted Dibble by phone and met, with Dibble in person.

223.    In such calls and at such meetings, Dibble was repeatedly threatened with retaliation measures if he continued raising improprieties of the Village and SHLDC bidding process, and told, inter alia, if he continued to question the

bidding process, he could forget about getting any more work from the Village and/or the SHLDC and it would be the worst business decision he ever made.

224.   During this same period, and at these meetings, Schroedel, Giaccio, Rosenbaum and Dowley also advised Dibble, more than once, that they had instituted procedures to make sure contracts awarded by the Village and the SHLDC would be done by a proper bidding process in the future.

225.   These representations by Schroedel. Giaccio, Rosenbaum and Dowley was false when made, was known to be false and was made with the intent that Plaintiffs would rely on the same.

226.   Plaintiff did rely on such representations that the bidding process would be corrected and would be fair and proper in the future and, at least for a time took no further steps, in the following months, to investigate the collusion that had occurred in the May-June, 2017 bid process.

227.   In fact, no procedures were instituted to make sure bidding was properly done in the future and it was repeated in the future. In fact, Schroedel would arrange to have the fill brought to the job site, also without doing a public bid, and by contacting individuals and companies in New Jersey, to bring recycled materials to the East Parcel from Queens, while telling Plaintiffs and other

contractors to submit bids only to bring clean fill in from a DEC site in Valhalla, New York.

228.   On being asked by third parties why Dibble had not been awarded the bid, Schroedel responded, to the effect that Dibble had blown his chance to get the contract as a result of the "incident in the manor" regarding James McGovern.  In essence confirming that Plaintiffs, at least at that time, were not going to get further work from the Village or the SHLDC, no matter what the bids were.

229.    No mention was made that Cortese Corp. had secured preferential status with Schroedel and other members of the conspiracy or the manner in which the "bid process" was arranged to put Plaintiffs and other contractors at a disadvantage.

230.   Cortese had achieved preferential treatment by members of the conspiracy (or their associates) in several ways. First, by building a house, on specifications, and selling it to Michael Dowley (successor to Schroedel as Director of SHLDC. Second, Cortese also had a long-standing relationship with Stolski Automotive, another favored contractor of Schroedel, Wray and Leavy. Stolski, on information and believe, provided free or heavily discounted automotive services to Schroedel, Wray and Leavy in order to be in position to be

60

an advocate for Cortese. Finally, as set forth above (First Cause of Action), Cortese paid bribes to secure his position as the favored bidder.

231.   As a result of such actions, Plaintiffs were denied a contract where they had been low bidder or would have been low bidder but for the collusive bidding process set up by Schroedel, Wray, Leavy, the SHLDC and HMC.

232.   Cortese knew or should have known that receiving information about Dibble's bid was part of a collusive bid rigging arrangement and they were participating in such arrangement.

233.   Earth Improvements knew, or should have known, that when asked to submit a "cover bid" they were part of a collusive bid rigging arrangement and were participating in such arrangement.

234.   As a result of such actions, by Schroedel, HMC, Giaccio, Wray, Leavy of the SHLDC, together with the support of Cortese and Earth Improvements.  Plaintiffs have been damaged in an amount not presently known but believed to be at least $100,000.00 on fixing the May 2017 bid to manage fill brought to the East Parcel and $40,000.00 on fixing the bid to deliver fill to the East Parcel.

AS AND FOR A THIRD CAUSE OF ACTION
Collusive Bidding, Bid Rigging Rigging in Violation of the Sherman Anti-trust
Act 15 USC Sec 1-38 against Schroedel, HMC, Giaccio, Leavy. Wray, SHLDC
and Cortese

235.    Plaintiff repeats and realleges each and every allegation in
paragraphs 1 to 190 and 192 to 234.

236.  On or about October 18, 2017, the SHLDC issued a request for
proposals for fill management services at the East Parcel Development Project,
known as RFP 101817.

2379. Pursuant to the proposal. all bids were to be submitted no later than
10:00 AM on November 9, 2017 with no exceptions permitted.

238.  The RFP was deliberately made confusing as to the scope of the work
to be done to discourage any bidders other than the contractor that had been pre-
designated by Schroedel and HMC as to the contractor to get the award, which
was Cortese.

239. Plaintiffs, being familiar with the East Parcel, and having an expertise
in the type of equipment that would be needed, was able to submit a bid that
outline the cost per piece of equipment that would be needed daily.

240. Approximately 15 minutes before 10:00 AM on November 9, 2017, Plaintiffs, by Karl Dibble, submitted their proposal for the work in REP 101817, at the designated location and had it time stamped.

241. At the time Karl Dibble submitted his bid, no other bids had been submitted.

242. Within a few minutes after submitting his bid, Joan Bucci, the Secretary for the SHLDC, left the SHLDC offices with a large bag. On information and belief, Ms Bucci had Plaintiffs bid in her possession and got into a car that was outside the building and met with an individual believed to be Nicholas Sariah.

243. On information and belief, these actions were taken on the instructions of Schroedel directly or by Schroedel giving his instructions through Anthony Giacco, the CEO of the SHLDC.

244. While Karl Dibble waited in the office of the SHLDC, Anthony Giaccio, the CEO of SHLDC came into the hallway and remained there.

245. Approximately five minutes after 10:00 AM, Nicholas Sirriah entered the building and walked toward Mr. Giaccio, who advanced to him and took from Sirrah a folder filled with documents.

246.   The fact that Mr. Sirriah was expected, and expected with a bid, made it clear that Mr. Giaccio had received a message, by phone or other electronic communication, that Sirriah would be arriving with a bid for RFP 101817.

247.   The folder was identified by Mr. Giaccio as having a bid in it by Cortese for the work known as REP 101817.

248.   This bid was not in a properly sealed envelope.

249.   The bid was also submitted after the time for submitting bids.

250.   Karl Dibble protested that the SHLDC could not accept the bid that was not properly submitted and submitted late.

251.   Dibble was told by Mr. Giaccio that he was not accepting the bid delivered by Mr. Sirriah and that he and that he may not accept Plaintiff's bid either.

252.   No reason was given by Mr. Giaccio as to why Dibble's bid, which was submitted timely and in the proper fashion, might not be accepted.

253.   On information and belief, Giaccio had been advised by Schroedel, or other members of the conspiracy, that the members of the conspiracy did not want Plaintiffs (or any other contractor) to get the bid.

254.    Giaccio refused the request by Dibble to open the folder given to him by Sirrah to confirm that Sirrah had not been shown Plaintiff's bid prior to the belated submission of the Cortese bid.

255.    Shortly thereafter, Schroedel (who had no position with the SHLDC or the Village), who had clearly been contacted by phone or some other electronic communication and knew that the Cortese bid had not been submitted on time and that a demand had been made to examine the bid, showed up at the SHLDC offices and was interviewed by the police (to the exclusion of Giaccio) about the bid process.

256.    Schroedel also refused to permit confirmation of the late bid had been independently done or offer any reason why the contract might not be awarded to Dibble.

257.    Although Plaintiff's had the lowest and only bid for the work, the contract was not awarded as it had been designed to only be awarded to Cortese to the exclusion of other contractors, including Plaintiff. At no point was Dibble ever advised that Plaintiff's bid had not been accepted. However, in May of 2018, Dibble was told by Katarzyna Arencibia, that she had been told by defendant Leavy that she could not purchase materials from the Plaintiff to use on a project that she had was doing for the Village. This further confirmed at or about that point

that the members of the conspiracy had determined they were not going to award

the bid to Plaintiffs and would seek to keep Plaintiffs in the dark concerning that

decision.

258.    The loss to Plaintiffs would cost the Plaintiffs an amount in excess of

$5,000,000.00.

## AS AND FOR A FOURTH CAUSE OF ACTION
<u>Interference with existing business relationship and prospective contractual
relations by Defendant McGovern and Defendant Leavy</u>

259.    Plaintiff repeats and realleges each and every allegation in paragraphs

1 through 190, 192 to 234, 236 to 258.

260.    For a period of more than fifteen years, Plaintiffs worked in the

Village of Sleepy Hollow and surrounding municipalities. Such work was done for

private customers and for the local municipalities. With respect to the

municipalities, such work was usually the result of being awarded contracts based

on public bidding in compliance with the General Municipal Law.

261.    For at least fifteen years prior to 2017, Plaintiffs had regular and

ongoing contracts with the Village.

262.    After its founding in 2014, SHLDC let out a bid to crush concrete and other waste into useable fill at the East Parcel and SHLDC awarded the bid to Plaintiffs as low bidder.

263.    Dibble also had discussions with Schroedel and Leavy in which additional work on the East Parcel was discussed and it was represented that at least some such projects would be set out for bid and acknowledged that they would likely be awarded to Plaintiffs, who had a history of submitting competitive bids.

264.    On or about April 22, 2017, McGovern initiated an argument with Karl Dibble while Dibble was delivering materials several houses away from the McGovern residence.

265.    As a result of the argument, McGovern instructed his wife, to post on the internet, disparaging comments about Dibble and/or his companies Karl Dibble Inc and/or River Rock Supply Inc.

266.    McGovern knew of the existing contracts Plaintiffs had with the Village and the SHLDC and told Dibble that he would see to it that Plaintiffs "got no further work" from the Village or the SHLDC and would contact his "friends" to make sure this happened.

267.   McGovern, like Defendants Schroedel, Wray and Leavy, was also a member of the Beach Club.

268.   McGovern and Leavy are not only both members of the Beach Club, but hold positions of management there, Leavy being a Vice President of the Beach Club and McGovern a member at large.

269.   On information and belief, McGovern sought out Leavy (who worked closely with Schroedel, to complain to him about Plaintiffs and to utilize the access that Leavy, as a Village trustee, had to Wray, Schroedel and Giacco.

270.   These defendants were sought out by McGovern and/or Leavy to use their influence to deny Plaintiffs additional work from the Village and the SHLDC and end any work then in progress, in essence, to make sure that Plaintiffs, would be one of the persons that would be discriminated against in the future, and direct such business to others.

271.   McGovern and Leavy, on information and belief, contacted other members of the Beach Club, to persuade them to use their influence with Schroedel and Wray to deny or seriously limit Plaintiffs receiving any more contracts from the Village or SHLDC.

272.    Such actions were taken when McGovern and Leavy knew of the economic and contractual relationship that Plaintiffs had with the Village of Sleepy Hollow and SHLDC, the history of Plaintiffs doing work for the Village of Sleepy Hollow and the SHLDC, the certainty that such work would continue to be required by the Village of Sleepy Hollow and the SHLDC. McGovern and Leavy would also know that Plaintiffs, as a local contractor, had a competitive advantage in being able to provide services to the Village and the SHLDC due to the proximity of the work to that anticipated work sites in the Village and the East Parcel, would almost certainly be in line to continue to obtain such work.

273.    In fact, McGovern would subsequently brag to Dibble that he had contacted his "friends" and Dibble would not get any jobs on upcoming bids.

274.    At this time, in April of 2017, the SHLDC had already announced plans for the development of the East Parcel, which would include substantial amounts of work that could be performed by Plaintiffs primarily in bringing on to the East Parcel site, what was promised to be at least 150,000 cubic yards of fill, and to manage such fill to start to raise the level of the East Parcel as a result of flooding in the area from the Pocantico River. This would be one of the first phases for the preparations for improving the East Parcel.

69

275.   Plaintiffs, had in fact, recently (in the fall of 2016) completed a contract with the SHLDC, for $44,000.00, for site work on the East Parcel, including crushing operations of stone on the site.

276.   As a result of discussions with Schroedel, prior to the McGovern argument, in which Schroedel told Plaintiffs that Plaintiffs could expect to have the opportunity to bid on additional site work, that would be worth "millions of dollars" and that Plaintiffs (based on their previous experience with the Village and the SHLDC and the proximity to the site), would be expected to be awarded, at least part of such work which would include, but not be limited to:

a) Removing materials that could be turned into mulch;

b) Bringing in fill materials;

c) Stockpiling and managing fill materials once they are delivered to the East Parcel;

d) Working on dredged material to make is suitable for use as fill;

e) Removing materials that had been brought by Sentrale (a third party contractor) to the site;

f) Removing railroad tracks from the East Parcel; and

g) Paving parking lots.

277.    Beginning in April of 2017 and continuing thereafter for a least several months, Leavy (at the request of McGovern, and/or others), not acting in an official capacity but in an individual capacity as a member of the Beach Club, assisting another member of the Beach Club, and/or McGovern contacted Schroedel and Wray (and possibly others, presently unknown) to take such steps as they could to stop awarding contracts from the Village and/or the SHLDC to Plaintiffs.

278.    On information and belief, Schroedel and Wray agreed that they would take steps not to let Plaintiffs receive any more contracts from the Village and/or the SHLDC and conveyed the same to Leavy and/or McGovern.

279.    As a result of the actions by McGovern and Leavy, Plaintiffs ceased to receive contracts from the SHLDC and the Village of Sleepy Hollow (other than the ongoing purchase of minor supplies and an occasional routine emergency equipment rental from the Department of Public Works). This was done by:

a) rigging a contract let out for bid, to handle and manage fill for a period of thirty days at the East Parcel in June of 2017;

b) making sure to keep Plaintiffs in the dark about contracts to deliver recycled fill to the East Parcel;

c) rigged a contract for fill management services on the East Parcel in November of 2017, or sometime thereafter, on which Plaintiff was the only timely bidder to make sure Plaintiff would not be awarded the bid;

e) the blocking of any subcontract work that would have been obtained from Kataeyna Arencibia, who was working on a landscaping project for the Village;

f) prohibiting Plaintiffs from fulfilling a contract with Sentrael Contracting to remove stone that had been stored on the East Parcel;

e) advising Village employees not to purchase goods from Plaintiffs; and

f) ordering a substantial and/or complete reduction of using Plaintiffs for snow removal and asphalt paving in the Village, as had been done for at least 15 years.

280.   The actions by McGovern and Leavy were taken intentionally, with malice, for the sole purpose of harming Plaintiffs, in order to prevent Plaintiffs, from receiving consideration or the awarding of additional contracts from the Village of Sleepy Hollow or the SHLDC.

281.   As a result of the actions, and but for such actions, by Defendants McGovern and Leavy, Plaintiffs were not awarded contracts for the redistribution of fill on the East Parcel in June of 2017 and for Fill Management Services on the East Parcel in November of 2017, subcontract work with Katarzyna Arencibia, sale of supplies to the Village and contracts for emergency snow removal and asphalt paving work and denied the opportunity to even bid on the delivery of recycled fill to the East Parcel.

282.   On information and belief, but for the actions of McGovern and Leavy Plaintiffs would not have been moved from the list of contractors that were favored by the Enterprise and Plaintiffs would have received both contracts.

283.   The actions by McGovern and Leavy resulted in damages to the Plaintiffs on the June 2017 contract in the amount of approximately $50,000.00 and on the second contract, in November of 2017 in an amount not yet determined but believed to be in excess of $5,000,000.00.

AS AND FOR A FIFTH CAUSE OF ACTION
Interference with Existing Contract
By Schroedel, SHLDC, HMC, McGovern and Leavy

284.   Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 190, 192 to 234, 236 to 258, and 260 to 283.

285.   At some time prior to April 1, 2017, Sentrael Contracting entered into a contract with SHLDC, to temporarily place rock and fill they were removing from the Rockefeller Estate at Kykuit which needed to be temporarily removed in order to install a water tower.

286. Under their agreement with SHLDC, Sentrael was required to remove any rock and fill they brought to the East Parcel that they were not returning to be

used at the Rockefeller Estate. In April of 2017, such material, not brought back to the Rockefeller Estate was still on the East Parcel site.

287.  In the presence of Dibble, Schroedel called an attorney, David Rothman, who on information and belief, represented the SHLDC, and told Rothman he wanted to pursue Sentrael for damages for not removing the rock and fill they had deposited on the East Parcel. At or about the same time Dibble advised Schroedel he was in discussions with Sentrael to remove such rock and fill and expected to have an agreement shortly.

288.  On or about June 10, 2017 Dibble entered into an agreement with Sentrael Contracting Corporation to remove this excess rock and fill from the East Parcel.

289. Schroedel was aware of the contract the Plaintiffs had with Sentrael.

290. On information and belief, McGovern and Leavy were aware of the contract Plaintiffs had with Sentrael.

291. On June 13, 2017 Plaintiffs started to remove the fill, in accordance with his agreement with Sentrael.

292. The SHLDC, acting at the direction of HMC, Schroedel and or his agents, and using the mail and wires, called the Village police to stop Plaintiffs from completing their contract.

293. Schroedel and/or his agents falsely represented that SHLDC owned the fill and instructed the police to stop Plaintiffs from fulfilling his contract with Sentrael.

294. The police did stop Plaintiffs from fulling its agreement with Sentrale.

295. The actions by Schroedel, Leavy, McGovern SHLDC and HMC were the direct cause of damage to Plaintiffs.

296. But for the interference by Schroedel, Leavy, McGovern SHLDC and HMC, Plaintiffs would have been able to complete their contract with Sentrale and remove the rock and fill.

297. As a result of the actions of the Schroedel, HMC, Leavy, the SHLDC and McGovern, Plaintiffs were prevented from fulfilling his contract.

298. The actions by Schroedel, HMC, Leavy, SHLDC and McGovern were for the sole purpose of harming Plaintiffs.

299. Neither Schroedel, HMC, Leavv SHLDC or McGovern, had any legitimate economic interest to advance by interfering with Plaintiffs contract with Sentrael.

300. As a result of the actions of SHLDC and Schroedel, Plaintiffs have been damaged, in an amount not presently known, but believed to exceed $50,000.00.

### AS AND FOR A SIXTH CAUSE OF ACTION
Interference with Existing Contract
Against Schroedel and HMC

301.  Plaintiff repeats and realleges each and every allegation in paragraphs 1 to 190, 192 to 234, 236 to 258, 260 to 283, 285 to 300.

302. For more than fifteen years, Plaintiff had done property maintenance for the Historic Hudson Valley and as part of the agreement, left maintenance equipment on the property owned by the Historic Hudson Valley, primarily for use on that property.

303. During this period, Dibble had been advised by Paul McCarthy of the Village of Sleepy Hollow, that he did not need a landscapers' s license for the Village, if he was only providing maintenance for one property and the machines were there for that purpose.

304. In 2018 Martin Gotte, a Village of Sleepy Hollow Code enforcer, issued a violation of the zoning laws, asserting that, Dibble was operating an illegal landscaping business and illegal storing equipment on the site despite having been told it was permissible for 15 years and with the concurrence of the Village.

305. Rather than deliver the violation to Dibble, the individual accused of violating the zoning laws, Martin Gotte delivered the violation to the Historic Hudson Valley.

306. When Dibble inquired as to why the violation was given to his customer, which would have the effect of causing the customer to cease using Dibble, Gotto told him that he had been directed by the Village Justice to serve the owner of the property.

307. On information and belief, the Village Justice did not so instruct Gotte to serve the violation in such a fashion, and such statement was false when made, known by Gotte to be false when made.

308. On information and belief, and other actions, such as having the Village Superintendent of Public Works, recommend to the Historic Hudson Valley Association that they used another contractor, were taken at the direction of Schroedel, HMC and or those working on his behalf as part of the retaliation

against Plaintiffs for renewing their continued investigation of the bidding process and for speaking to law enforcement officers, investigating the bidding process.

309. The actions were taken with the intent the Dibble would lose his long standing contract with the Historic Hudson Valley Association and incur the cost of moving his equipment from the location where it was used and ongoing costs of moving the equipment back to the site to do work there each year.

310. In fact Plaintiffs did have to move their equipment and now incur additional costs to perform the work they had been performing at the Historic Hudson Valley site as a result of this interference with their contract with Historic Hudson Valley.

311. Thereafter, in September of 2018 Dibble was given a violation for having a construction vehicle on the East Parcel, after having been given permission to place the machine at that location years earlier, and where he regularly engaged in doing work for the Village and the SHLDC.

312. Dibble received a letter, from an attorney alleging he was acting on behalf of the SHLDC and stating there was an "express understanding that such equipment would be removed from the site [the East Parcel] no later than Saturday September 16, 2017.

313. On information and belief, such instructions to Rothman came from Schroedel, even though Schroedel had no position with the SHLDC at the time. On information and belief, such actions were taken at the direction of Schroedel, HMC and or those working on his behalf as part of the retaliation against Plaintiffs for renewing their continued investigation of the bidding process and for speaking to law enforcement officers, investigating the bidding process.

314. The representation that there had been an "express understanding" was false and known to be false by both Schroedel and Rothman at the time it was made, and it was made, with the threat that Plaintiffs equipment, would be seized by the SHLDC if it was not immediately remove and if Plaintiffs then tried to utilize its own property, it would could be sued by the SHLDC to recover for itself, the Plaintiff's property.

315.  As a result of such actions, Dibble has incurred ongoing expenses to move and store his equipment.

316. As a result of such actions Dibble was injured in an amount not presently fixed but believed to be in excess of $10,000.00.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Injunction Against the Village and the SHLDC

317.  Plaintiff repeats and realleges each and every allegation in paragraphs

1 through 190, 192 to 234, 236 to 258, 260 to 283, 183 to 300, 301 to 316.

318.  On information and belief, the SHLDC and/or the Village, intend to

seek to do additional work on the East Parcel and in the Village and have

announced that they have a plan for additional site work and construction on the

East Parcel that will take them through 2026.

319.  On information and belief, in accordance with past practices, the

SHLDC and the Village will seek to issue such work without complying with

Federal, State and Local law will seek to obtain collusive bids.

320.  The SHLDC and the Village and their representatives and

consultants, should be enjoined from entering into new contracts that do not

comply with Federal, State and Local Law bidding requirements or engaging in

collusive bidding practices.

321.  There being no adequate remedy at law to prevent such ongoing

activity.

322.   Plaintiffs request an injunction, to bar the Village and the SHLDC from issuing contracts without first offering to the public, Requests for Proposals, that outline the work being sought, a reasonable estimate as to the amount of work being required and the time frame for such work and that such bids be submitted in seal envelopes and remained sealed until the time and date of opening and reviewing such bids, which should be on the same day the bids are submitted and that such opening be done in a public setting to ensure or limit the opportunities for collusive bidding.

323.   Plaintiffs demand a trial by jury.

WHEREFORE, Plaintiff demands judgment as follows:

1. On the first cause of action, for violating various provisions under RICO,

a) Against the members of the SHLDC Enterprise and the Philipse Manor Enterprise an amount believed to be in excess of $100,000.00;

b)  Against the members of the SHLDC Enterprise and the Philipse Manor Enterprise in an amount believed to be in excess of $120,000.00.

c) Against the members of the SHLDC Enterprise and the Philipse Manor Enterprise in an amount in excess of $5,000,000.00

d) Against the members of the SHLDC Enterprise and the Philipse Manor Enterprise in an amount in excess of $10,0000

e) Against the members of the SHLDC Enterprise and the Philipse Manor Enterprise in an amount in excess of $15,000.00;

On which all members of the SHLDC Enterprise and the Philipse Manor Enterprise would be jointly and severally liable;

2.     On the second cause of action, against Schroedel, HMC, Giaccio, Leavy, SHLDC, Wray, Cortese, Cortese Corp and Earth Improvements for violating federal and state anti-trust laws, an amount not presently fixed but believed to be in excess of $100,000.00;

3.     On the third cause of action, against Schroedel, HMC, Giaccio, Leavy. Wray, SHLDC and Cortese for violating federal and state anti-trust laws, in an amount not presently fixed but believed to be in excess of $5,000,000.00;

4.     On the fourth cause of action for interference with existing and future contracts, against McGovern and Leavy for an amount in excess of $5,000.000.00;

5.     On the fifth cause of action Schroedel, SHLDC, HMC, McGovern and Leavy for interference with Plaintiff's contract with Sentrale for damages against for an amount in excess of $50,000.00;

6.     On the sixth cause of action for interference with existing contracts related to the Historic Hudson Valley for damages against Schroedel and HMC for an amount in excess of $10.000.00;

7.     On the seventh cause of action for an injunction against the SHLDC and the Village to enjoin the future awarding of bids in violation of the Municipal law or the Sherman anti-trust act or the laws of the State of New York

8.    Plus treble damages as permitted by, together with attorneys fees where permitted by law, together with interest and costs and such other relief as to this court appears just and proper.

Dated: September 16, 2019

Yours etc.
Crystal & Donohue

By_____
        James P. Donohue, Jr.
99 Church Street
4th Floor
White Plains, New York 10708
(914) 397 1120